(43 South. 663.)

No. 15,899.

ALBA v. PROVIDENT SAVINGS LIFE ASSUR. SOCIETY OF NEW YORK.

(March 18, 1907. Rehearing Denied April 29, 1907.)

1. APPEAL — DISMISSAL — VERBAL INACCURACIES.

When, from the motion and order of appeal, it is clear that it is the litigant, through his counsel, who complains of the judgment, and who prays for, and is allowed, the appeal, such appeal will not be dismissed because of some slight confusion in the pronouns used.

2. INSURANCE—POLICY—CHANGE OF BENEFICIARY.

Where, by agreement between the insurer and the assured, a beneficiary is named in a policy of life insurance, subject, however, to the expressed condition that the assured may, thereafter, at any time, upon notice to the insurer, change such beneficiary, the original beneficiary has no standing to interpose between the contracting parties, and prevent the assured from exercising the right thus secured to him by his contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 473.]

3. SAME—WHO MAY QUESTION CHANGE.

When the original beneficiary, named in a policy of life insurance which authorizes the assured to change the beneficiary at any time, is the wife of the assured, and the assured, thereafter, changes the beneficiary and assigns the policy to the person whom he substitutes for the wife, the question of the validity of the change and assignment so made is one that, in no manner, concerns a minor child, issue of the marriage between the assured and his said wife.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by Louis R. Alba against the Provident Savings Life Assurance Society of New York. Judgment for defendant and intervener, and plaintiff appeals. Reversed, and judgment rendered.

Dinkelspiel, Hart & Davey, for appellant. Farrar, Jonas & Kruttschnitt, for appellee defendant. William Stirling Parkerson and Bernard Bruenn, for appellee intervener.

Statement of the Case.

MONROE, J. In April, 1902, Eustace J. Shearman presented a petition to the civil district court for the parish of Orleans, alleging the death, in March of that year, of Alphonse J. Bachmin, and further alleging that the decedent had left a minor child, issue of his marriage with Ulrika Marie Magner; that he had left an estate, within the jurisdiction of the court, which required administration; and praying that an inventory

be made, and, after due proceedings, for letters of administration. This application was opposed by Mrs. Ulrika Marie (Magner) Bachmin, as widow and natural tutrix, on the grounds that the succession owed no debts, and that, in any event, she was entitled to the administration, and, the opposition having been maintained, the opponent qualified as tutrix, and Chas. B. Maguire was appointed undertutor of the minor.

In July following, Shearman, brother-in-law, and George G. Magner, brother, of Mrs. Bachmin, presented affidavits to the court representing that the decedent had left a policy of life insurance for $3,000 (issued by the company herein made defendant), which belonged to his estate; that Louis R. Alba was asserting a claim to the proceeds, though, as affiants believed, he was not entitled to the full amount thereof; that Mrs. Bachmin, though aware of the facts, had omitted to include said policy in the inventory, as an asset of the succession; and that the undertutor, Maguire, had declined to take any steps to prevent the collection of said proceeds by Alba. And affiants prayed that a curator ad hoc be appointed and authorized to bring suit for the removal of said tutrix and undertutor.

George H. Magner was, accordingly, so appointed and authorized, and on July 25, 1902, brought suit for the purpose mentioned, to which suit both defendants excepted. Maguire then resigned, and Shearman was appointed undertutor in his stead; but no further steps were taken in the proceeding for the removal of the tutrix, which is still pending, on the exception filed by her. In the meanwhile, the present suit had been instituted by Louis R. Alba, who alleges that he is the assignee, for value, of the policy mentioned, and prays that the defendant company be condemned to pay him the amount called for by it, and Magner and Shearman (as nearest of kin and undertutor, respective-

ly, of the minor) had intervened, alleging, in substance, that the assignment set up by plaintiff was in the nature of a pledge to secure a loan of a smaller amount than $3,000, and that if it were otherwise, then that the transaction was a speculation upon the probable death of the assured, which is reprobated by law; reiterating the allegations contained in their affidavits and in the suit brought by Magner, as to the nonaction of the tutrix and former undertutor; and praying that the proceeds of said policy be decreed to belong to the succession of Bachmin. Plaintiff excepted to this intervention, on the grounds that interveners were without right or capacity to appear and stand in judgment, and that the intervention disclosed no cause of action, and defendant answered, depositing in court $2,914.72, as the amount due under the policy, after which plaintiff's exception to the intervention of Magner and Shearman was maintained. The widow and tutrix then appeared, by answer and intervention, contesting the right of defendant to make any deductions from the amount called for by the policy, admitting that, though originally payable to her, said policy "was subsequently changed as to the beneficiary, so that her deceased husband * * * was himself made the beneficiary," and praying that the proceeds be awarded to his estate "subject to any legal claims thereon." This was followed by another intervention by Shearman, undertutor, repeating his previous allegations, and further alleging conspiracy between plaintiff and the tutrix and conflict of interest between the latter and the minor, and praying judgment as before, to which plaintiff interposed the exceptions of res judicata and want of capacity, which exceptions having been maintained, the intervener appealed, and the judgment appealed from was reversed by this court, and the case remanded for further proceedings. Mrs. Bachmin, individually, had, in the mean-

while, filed another intervention, asserting title to the whole fund, as the original beneficiary named in the policy, and praying for judgment accordingly, which intervention having been dismissed, on exception filed by plaintiff, she abandoned the controversy, and the case was tried on its merits as between plaintiff and the undertutor; the amount deposited by the defendant company having been accepted by both as the correct amount due.

The facts, as we find them from the record, are as follows: In the fall of 1901, the assured (Bachmin), having previously pledged the policy in question to secure a debt of $100, with interest, and being without means either to pay the debt, or to pay the quarterly premium which fell due in September, or, in fact, for any other purpose, applied to the agent of the defendant for a loan, on the policy, which was refused. He then mentioned the matter to Mr. Millaudon, who had been his fellow employé in a mercantile house, and who, being asked: "What did he tell you?"—replies and testifies as follows, to wit:

"That he had his policy pledged to somebody, whom I don't know, and that he didn't have any money. I told him: 'Why don't you sell it?' He said: 'I don't know anybody that would buy it.' And he told me, if he knew anybody that would buy it, that he would sell it. I spoke to Mr. Alba about it, and Mr. Alba went to see him. Q. After that, what did Bachmin tell you? A. The very day that Mr. Alba seen Bachmin I seen Bachmin in the evening, and he told me he had sold the policy to Mr. Alba."

The formal, written assignment of the policy, approved by the defendant company, and containing no suggestion of a pledge, is further corroborated by the testimony of Mrs. Peltz, a relative of Bachmin's, with whom he was boarding, to the effect that he told her that he was expecting a gentleman to call on him about a policy of insurance that he wished to dispose of; that the gentleman (who was Mr. Alba) called, and was evidently a stranger to Bachmin; that, after

he had gone, Bachmin told the witness "that everything was all right; that he had disposed of his policy; that Mr. Alba had saved him." And being asked, "why," had replied, "Simply because the policy was to expire very soon, and I couldn't redeem it," or something to that effect. By the testimony of Mrs. Millaudon, to the effect that Bachmin told her that he had sold his policy to Alba; by the testimony of Braun, the agent of the defendant company (and quite a prominent witness for defendant), to the effect that Bachmin asked him for a loan on the policy, telling him that it would be a good investment, as he had not long to live, but that he (Braun) refused to make the loan, that Alba then came to him and made some inquiry as to how long a man exhibiting certain symptoms of Bright's disease would be likely to live; which testimony then proceeds as follows:

"[By the witness.] I stated to him that, if I was him, I wouldn't have anything to do with it. Q. [By counsel for intervener.] Why did you tell him that, Mr. Braun? A. Well, I had no particular reason for it. Q. But why was it, what was the reason that you advised him not to have anything to do with the policy? A. Well, because I didn't think he ought to speculate on the life of a man who was so near death's door. Q. You knew then that he was intending to have some transaction with Mr. Bachmin concerning his policy? A. Yes, sir. Q. And the impression produced on your mind by Mr. Alba's conversation was that he intended to speculate with that policy? A. Yes, sir. Q. Now, Mr. Braun, where did you get your knowledge of Mr. Bachmin's physical condition? A. From Mr. Bachmin, at first. * * * Q. Now, after this conversation, in front of Mr. Alba's store, did you ever see Mr. Alba again? A. Yes, sir. Q. Did you ever have another conversation with him with reference to the policy? A. Only when the assignment was made. Q. That means that he notified you of the fact that an assignment had been made? A. No, sir; Mr. Bachmin came to my office and told me that he was going to assign the policy to Mr. Alba. He told me he was getting $500 on the policy. There was an assignment at the time to Mr. Nix, which was taken up, and a new assignment made. Q. Mr. Bachmin told you, at the time, that he was getting $500 for the assignment he was then making? A. He did tell me that; yes, sir. Cross-Examination: Q. You stated that this conversation [with Alba], as near as you can recall it, was in the

month of October? A. Yes, sir. * * * Q. Now, Mr. Braun, on October 19, 1901, what was the cash surrender value, if any, to the company of this policy? A. None at all. Q. According to the term of this policy, the premiums were due every quarter, on the 9th day of September, December, March, and June of each year? A. Yes, sir. Q. On the 19th of October, 1901, had the quarterly premium, which fell due on September 9th, been paid? A. I think that was paid by Mr. Alba. * * * Q. I now show you a check of L. R. Alba, * * * dated November 5, 1901, in favor of Max Braun, agent, for $35.56, and ask you whether you received that check in payment of that premium and interest? A. Yes, sir; on November 5th. * * * Q. Suppose the premium had not been paid when the extension expired, what would have happened to the policy? A. The policy would have lapsed. Q. Without any value to the insured? A. Oh, yes."

He subsequently stated that the premiums which had been paid would have kept the policy alive about 15 months longer.

Shearman, the intervener, testifies that Alba told him, at Bachmin's wake, that Bachmin owed him about $600, but that everything should be all right, and that he (Shearman) did not know to what Alba was alluding. Millaudon, who spent the night of the wake at the Bachmin residence, testifies, on the other hand, that he, then and there, told Shearman, in answer to a question from the latter, that Alba had bought the policy, and that Shearman said that he did not know that Bachmin wanted to sell, or he would have bought it himself; and Millaudon's testimony is corroborated by that of Mrs. Millaudon, who heard the conversation. Daponte, another of intervener's witnesses, testifies that Bachmin owed him $300 (and, apparently, had owed it for an indefinite period), and that he offered to buy the policy for $1,800 (the $300 to be included in the price), but that Bachmin declined to sell. Whether the offer was made in 1897, when the policy was first issued, or at what time, we are not informed. It is out of the question to suppose that it was made at a date anywhere near that of the transaction here in question. It further appears from the evidence that,

after the assignment of the policy, Braun, the agent of the company, told Alba that "a man could not buy a policy in this state," and that Alba thereafter went to Bachmin and obtained from him his note for $3,000, in order to make his position more secure, which note he attached to the proof of loss submitted by him to the company. He, however, admits that the total amount paid for the policy was $612.50, after which he loaned Bachmin $50, and was repaid $15, and loaned Mrs. Bachmin $50.

Alba, himself, testifies positively that he bought the policy, and denies, positively, that he made any inquiry of Braun as to Bachmin's chances of life, or any statement to Shearman as to Bachmin's indebtedness to him.

There is no testimony in the record which tends, in the slightest degree, to substantiate the allegations of collusion and conspiracy between the plaintiff and the tutrix. To the contrary, it is only fair to Mrs. Bachmin to say that she seems to have been aware of the fact that her husband had parted with his policy of insurance for a price agreed upon; that she knew that he and she used the money, partly for the purpose of establishing a boarding house in New Orleans, and partly, as his condition became worse, to pay his expenses to San Antonio; that she felt that she ought to adhere to the bargain; and that it was only after she had been charged, by her brother and brother-in-law, with sacrificing the interest of her child, and after a judgment had been rendered by this court to the effect that, on the face of the papers, Shearman, undertutor, had a standing in court for the purposes of his intervention, that she seems to have considered it her duty, no doubt by advice of counsel, to present the legal proposition that her husband was without authority to change the beneficiary, and hence had no legal right to assign the policy to Alba.

## Opinion.

The policy in question witnesses a contract whereby defendant insured the life of Bachmin, and agreed to pay the loss to his wife "or his legal representatives or assigns (subject to the right of the assured to change the beneficiary)," to which condition (as contained in the parentheses thus incorporated in the body of the contract) there is added the further express stipulation, as follows, to wit:

### "Change of Beneficiary.

"This policy is issued in favor of the beneficiary, or beneficiaries, specified on the first page hereof, with the express understanding that, if this policy shall not then be assigned, the assured may change the beneficiary, at any time during the continuance of this policy, by filing with the secretary a written request, duly acknowledged, such change to take effect upon its endorsement on this policy by the society."

It is beyond dispute that the change of beneficiary was made and indorsed as contemplated by this stipulation, and it is equally beyond dispute that, as the beneficiary originally named had acquired that status only by virtue of the agreement of the contracting parties, and only subject to the condition that she might be dispossessed of that status at their option, or, rather, at the option of the assured, she has no standing to contest a change made in the exercise of that option. There is no doubt, then, that the policy might, legally, have been assigned, without the consent of the original beneficiary, to the plaintiff, and this is conceded; the position of the intervener being that, in point of fact, and of intention, as between Bachmin and Alba, it was not so assigned for all that it called for, but was merely pledged to secure a loan of a smaller amount. This position, as we conclude, is not only unsupported, but is rendered wholly untenable, by the evidence. Moreover, we are unable, with all the facts before us, to discover what interest the minor, in whose behalf this litigation has been prosecuted, could possibly have in the matter. The mother was the original beneficiary named in the policy; the minor not being mentioned. Hence, if the change in the beneficiary, whether for the whole or for part of the amount called for, had been unauthorized, it would have been the mother, and not the minor, who would have been injured, since neither the proceeds of the policy nor any part of those proceeds would, in any event, have inured to the benefit of the latter, whether directly or through the succession of her father. Succession of Hearing, 26 La. Ann. 326; Succession of George and Frances Clark, 27 La. Ann. 269; Stuart et al. v. Sutcliffe et al., 46 La. Ann. 240, 14 South. 912; Succession of Emonot, 109 La. 365, 33 South. 368.

It was suggested in the argument of the case that the motion and order of appeal are made in behalf of the counsel for plaintiff, and not of plaintiff, and hence that the appeal should be dismissed, as was done in a recent case, in which that state of facts was presented. We do not, however, find that the facts in the instant case support the suggestion. The motion and order here in question read:

"On motion of Dinkelspiel & Hart, attorneys for the plaintiff, and on suggesting that *he* is informed and verily believes that there is error to *his* prejudice in a final judgment rendered herein, against *him*, and that *he* is desirous of appealing therefrom. It is ordered by the court that mover be allowed a suspensive appeal from said judgment, returnable to the honorable the Supreme Court of the state of Louisiana, on the first Monday of December, 1905, and upon *his* furnishing bond," etc.

The italicized words show clearly enough, though there is some confusion of pronouns, that it was the plaintiff, through his counsel, who complained of the judgment, and prayed for and was allowed the appeal, and the record shows that it was he who gave the bond. The motion and order in the case relied on are couched in very different language.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment ap-

pealed from be annulled, avoided, and reversed, and that there now be judgment in favor of plaintiff, Louis R. Alba, and against the defendant, the Provident Savings Life Assurance Society of New York, defendant herein, and also against intervener, Eustace J. Shearman, undertutor, decreeing said plaintiff to be entitled to the proceeds (amounting to $2,914.72), now deposited in the registry of the district court, of the policy of insurance here sued on. It is further adjudged and decreed that the intervention of said undertutor be dismissed, and that said Eustace J. Shearman, individually, pay the costs in both courts.